**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SEAN T. FRIEL** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **STEVEN T. MNUCHIN, Secretary of the** | : | |
| **Treasury, Department of the Treasury,** | : | |
| **Internal Revenue Service, Agency** | : | **NO.  19-2559** |

**MEMORANDUM OPINION**

**Savage, J.**                                                                                                    **July 23, 2020**

This action for sex discrimination brought under Title VII of the Civil Rights Act of 1964[1] arises out of plaintiff Sean Friel's consensual romantic relationship with a married supervisor. Friel complains of sex discrimination based on disparate treatment and retaliation. He also claims he was subjected to a hostile work environment due to sexual harassment by the supervisor and non-sexual harassment by her husband and his friends who work in the same office.[2] Defendant Steven T. Mnuchin, Secretary of the Treasury, has moved for summary judgment.

The Internal Revenue Service ("IRS")[3] moves for summary judgment, contending that the undisputed facts demonstrate that Friel has not made out a *prima facie* case of sex discrimination or retaliation. It also contends that there is no evidence of severe and pervasive discriminatory conduct rising to the level of a hostile work environment. Friel argues he has established *prima facie* cases of sex discrimination, retaliation and hostile

---

[1] 42 U.S.C. §§ 2000e et seq.

[2] Def.'s Mot. for Summ. J. Exh. A at 81:13-20 (ECF No. 11) ("Friel Dep. Tr.").

[3] Although Secretary Mnuchin is the nominal defendant, the IRS is Friel's employer. Therefore, we shall refer to the defendant as the IRS.

work environment. He contends it is for the jury to decide whether the IRS's reasons for its adverse employment actions are pretexts for sex discrimination and retaliation.

Friel has not established a link between any non-sexual harassment and sex discrimination. Nor has he made out a *prima facie* case of sex discrimination or retaliation. Even if he had made out a *prima facie* case of retaliation, the IRS is entitled to judgment because it has articulated a legitimate, non-discriminatory reason for his suspension and denial of a performance award which Friel has not rebutted with evidence of pretext. Friel has also not shown severe or pervasive sexual harassment rising to the level of a hostile work environment. Therefore, we shall grant the motion for summary judgment.

## Factual Background[4]

Plaintiff Sean Friel has worked for the IRS since 2002.[5] He has received all grade, step and salary increases to which anyone in his position was entitled.[6] His current salary level is the highest grade available for a customer service representative.[7]

Around 2012, he began a consensual romantic relationship with Claudia Hernandez, a supervisor.[8] They dated on and off until late 2015.[9] Hernandez was never

---

[4] Friel has not submitted a Statement of Disputed Facts in opposition to the IRS's Statement of Undisputed Facts as required by the Court's Scheduling Order. Sept. 19, 2020 Scheduling Order at ¶ 6(b), (d) (ECF No. 6). Thus, the Treasury Department's Statement of Undisputed Facts is deemed uncontested. *Id.* at ¶ 6(c); FED. R. CIV. P. 56(e)(2).

[5] Friel Dep. Tr. at 15:19-16:18; 21:5-11.

[6] *Id.* at 28:1-30:13; 245:11-247:5.

[7] *Id.* at 28:5-7; 245:16-246:1.

[8] *Id.* at 87:10-19; 117:2-4.

[9] *Id.* at 87:20-88:5.

Friel's regular supervisor, but she was his "manager of record."[10] Hernandez moved to a new position in 2019.[11]

When Friel began dating Hernandez, she was married to Nader Goudarzi, a supervisor in a different unit who did not oversee Friel.[12] According to Friel, when Goudarzi learned of the relationship, he began harassing him.[13] Friel characterizes the harassment as internet stalking, name-calling and intimidation.[14] Friel claims Goudarzi and his allies at the IRS prevented him from obtaining a shift change earlier so he could finish his college degree and pursue an alternate career path.[15] Friel obtained his requested shift change in June 2015.[16]

Friel permanently ended his relationship with Hernandez sometime in late 2015 because she did not report or do anything about her estranged husband's "screwing [him] over for years."[17] Friel testified that shortly after their breakup, Hernandez tugged on his

---

[10] A manager of record serves as an employee's supervisor when the employee's regular supervisor is out. *Id.* at 117:10-118:16.

[11] *Id.* at 147:25-148:13.

[12] Def.'s Mot. for Summ. J. Exh. R at 30:5-18; 11:5-15:22 ("Goudarzi Dep. Tr."); Friel Dep. Tr. at 82:11-15, 84:13-16, 104:6-7.

[13] Friel Dep. Tr. at 60:1-13.

[14] *Id.* at 60:3-6; 90:25-91:7; 95:10-19; 131:2-9; 133:5-17; 133:20-134:1.

[15] *Id.* at 58:11-59:7; 134:2-19; 192:1-17.

[16] *Id.* at 181:21, 217:15-218:25; Def.'s Mot. for Summ. J. Exh. J at FRIELUSA000736.

[17] Friel Dep. Tr. at 121:18-122:12, 150:10-14; Def.'s Mot. for Summ. J. Exh. H at 41:3-9 ("Hernandez Dep. Tr.").

shirt and suggested they "be together one more time."[18] According to Friel, Hernandez also texted him asking to get back together.[19]

In January 2016, Hernandez accused Friel of signing in late.[20] He was cleared of any wrongdoing.[21] The next day, Hernandez accused him of giving her a piece of paper containing an obscenity.[22] After investigating the incident, Christopher McCarthy, Friel's second-level manager, gave Friel a written warning that his actions were "inappropriate and unacceptable" and could result in disciplinary action if he engaged in similar behavior again (the "counseling memo").[23] Friel was not disciplined.[24]

In early 2016, Friel complained about ongoing harassment to an Equal Employment Opportunity ("EEO") counselor.[25] He received EEO counseling in May 2016.[26]

Friel later filed three EEO complaints. The first, filed on August 24, 2016, alleged sex discrimination.[27] The two later EEO complaints, filed September 7, 2017 and

---

[18] Friel Dep. Tr. at 142:4-14.

[19] *Id.* at 150:3-151:2.

[20] *Id.* at 247:15-248:2.

[21] *Id.*

[22] *Id.* at 248:2-12.

[23] Def.'s Mot. for Summ. J. Exhs. K, L at USAFRIEL001149-50.

[24] Def.'s Mot. for Summ. J. Exh. K; Friel Dep. Tr. at 252:6-253:13.

[25] Friel Dep. Tr. at 115:10-22; 116:17-19; 124:3-14. Friel also filed a complaint with the U.S. Treasury Inspector General for Tax Administration ("TIGTA") on February 18, 2016. Pl.'s Resp. Exh. 16 (ECF No. 15). The TIGTA complaint alleged Hernandez "engaged in retaliatory and improper management practices against [Friel] due to [Friel's] previous personal relationship with [Hernandez]." *Id.* at FRIELB000604.

[26] Def.'s Mot. for Summ. J. Exh. E.

[27] Def.'s Mot. for Summ. J. Exh. D.

November 7, 2018, alleged retaliation for filing the first complaint.[28] In March and June of 2019, the IRS issued final agency decisions in the second and third EEO cases, finding no retaliation.[29] In May 2019, the Equal Employment Opportunity Commission affirmed the IRS's final agency decision in the first EEO case, finding no discrimination.[30]

Belinda Curry, Friel's regular supervisor, evaluated his performance in 2015 and 2016.[31] She gave him an overall rating of 4 out of 5 in both years, a score corresponding to a performance of "Exceeds Fully Successful."[32] Although Curry lowered Friel's score in two of the evaluation categories in her 2016 review, she raised it in two other categories, resulting in the same overall score as the previous year.[33] Friel received the same time-off award in 2016 as he had in 2015.[34]

In 2018, Friel was suspended for five days without pay for two incidents that violated IRS policy.[35] On September 22, 2016, Friel emailed several IRS supervisors and copied the IRS Commissioner, the highest ranking official in the IRS, stating "I guess you people have been waiting for me to break. Congratulations, you got your wish."[36] He then

[28] Def.'s Mot. for Summ. J. Exhs. F, G.

[29] Def.'s Mot. for Summ. J. Exhs. F, G.

[30] Def.'s Mot. for Summ. J. Exh. D.

[31] Friel Dep. Tr. at 263:21-264:6; Def.'s Mot. for Summ. J. Exh. I at 117:16-18 ("Curry Dep. Tr.").

[32] Friel Dep. Tr. at 268:14-269:16; Def.'s Mot. for Summ. J. Exhs. M, N.

[33] Friel Dep. Tr. at 271:19-274:19; Curry Dep. Tr. at 117:25-118:3; Def.'s Mot. for Summ. J. Exhs. M, N.

[34] Def.'s Mot. for Summ. J. Exhs. M, N.

[35] Friel Dep. Tr. 279:1-4; Def.'s Mot. for Summ. J. Exh. O at USAFRIEL000170.

[36] Def.'s Mot. for Summ. J. Exh. O at USAFRIEL000170; Friel Dep. Tr. at 281:22-24.

left the building.[37] His departure caused a lockdown of the building's parking garage.[38] The second incident occurred on June 2, 2017, at 4:28 am, when Friel sent a series of text messages to TIGTA Assistant Special Agent in Charge Margaret Vandiehl regarding Hernandez's accusation that he gave her a paper containing an obscenity.[39] Friel demanded in one message that she "Make this shit right or I Will."[40] Vandiehl was disturbed by the messages and found them threatening.[41]

Patricia Gonzalez, Friel's third-level manager, imposed a five-day suspension for this conduct.[42] The suspension disqualified him for an annual performance award.[43] A panel of three IRS executives decided that Friel did not merit an exception to the policy.[44]

Friel filed suit on June 12, 2019.[45] After conducting discovery, the IRS moved for summary judgment.[46]

## Standard of Review

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.

---

[37] Def.'s Mot. for Summ. J. Exh. O at USAFRIEL000170.

[38] Friel Dep. Tr. at 282:15-19.

[39] Def.'s Mot. for Summ. J. Exh. O at USAFRIEL000170.

[40] *Id.* (errors in original).

[41] *Id.*

[42] *Id.* at USAFRIEL000174; Def.'s Mot. for Summ. J. Exh. P at USAFRIEL000184; Friel Dep. Tr. at 290:22-291:1.

[43] Def.'s Mot. for Summ. J. Exh. O at USAFRIEL000177; Friel Dep. Tr. at 287:25-288:18.

[44] Def.'s Mot. for Summ. J. Exhs. G at USAFRIEL000085, Q.

[45] Pl.'s Compl. (ECF No. 1).

[46] Def.'s Mot. for Summ. J.

CIV. P. 56(a). Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In examining the motion, we must draw all reasonable inferences in the nonmovant's favor. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).

Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted). Credibility determinations, the drawing of legitimate inferences from facts, and the weighing of evidence are matters left to the jury. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party. FED. R. CIV. P. 56(a). Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which it bears the burden of production. *Anderson*, 477 U.S. at 252. Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

A party moving for summary judgment may use depositions to show a fact is not genuinely disputed, and a party opposing the motion may rely on deposition testimony to

demonstrate that a fact is disputed. *See* FED. R. CIV. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions"). *See also In re CitX Corp.,* 448 F.3d 672, 680 (3d Cir. 2006) (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FED. PRAC. & PROC. § 2722, at 373, 379 (3d ed. 1998)) (observing that depositions are "one of the best forms of evidence for supporting or opposing a summary-judgment motion").

## Discussion

Although his complaint contains a single count, Friel asserts three separate causes of action – gender-based disparate treatment, retaliation and hostile work environment. We address each in turn.

### *Sex Discrimination Based on Disparate Treatment*

In his interrogatory answers, Friel identified three instances of alleged disparate treatment: (1) his requests for a shift change were denied; (2) he received a lower annual performance evaluation in 2016; and (3) he was improperly suspended and, as a result, denied a performance award.[47] In his deposition, he added that he believed his complaints were handled differently than those involving women bringing similar claims.[48] He contends the IRS applied unspecified IRS policy and practices differently.[49]

---

[47] Def.'s Mot. for Summ. J. Exh. C at 12.

[48] Friel Dep. Tr. at 76:17-79:8.

[49] These excerpts from his deposition reveal Friel's lack of specificity regarding a violation of IRS policies and procedures:

Q: Is there a policy or a procedure or a regulation or some type of rule that you allege was not followed when you asked to be separated from Claudia and Belinda?

A: I actually – there is a – yeah, I believe so. I mean, you can go on a few different

The IRS argues that Friel has failed to establish a *prima facie* case of sex discrimination.[50] According to the IRS, Friel admitted in his deposition that the actions he cited as examples of disparate treatment were not due to his sex.[51] The IRS contends that his lower performance evaluation was not an adverse employment action.[52] Regarding Friel's claim that his case was "handled differently," the IRS maintains that there is no admissible evidence in the record regarding other cases of harassment reported by women, and Friel has not identified a standard or policy that he alleges was not followed in his case.[53]

> government websites, and it speaks about sexual harassment, prevention of sexual harassment, conflicts of interest, impartiality, things like this, and it's inappropriate, it's unprofessional, and it's a hostile work environment.

*Id.* at 74:1-14.

> Q: In your Complaint and in your Answers to Interrogatories, you have not stated a specific rule or policy that wasn't followed, have you?
>
> A: There are ELMS and ethical violations. Every year we have to go over these courses and they state things of this nature, and it violates a lot of them, just about every one of them.

*Id.* at 74:18-75:1.

> Q: So as I read the Complaint, you're alleging that you were treated differently because of your gender, and that you were treated disparately from people of other genders. Is that how you understand it?
>
> A: When it came to the handling of the case, I believe my case was handled differently than if it was a female bringing complaints and allegations of harassment, sexual harassment, and the other things that were going on with Nader Goudarzi and others in management.

*Id.* at 76:17-77:6.

[50] Def.'s Mot. for Summ. J. at 10.

[51] *Id.* at 11-12; Def.'s Reply at 4 (ECF No. 17).

[52] Def.'s Mot. for Summ. J. at 11.

[53] *Id.* at 12; Def.'s Reply at 4.

Rather than addressing the IRS's arguments, Friel contends that his claimed harassment "evolve[d] out of a failed relationship that existed only because he was male."[54] Without citing any evidence or analysis, he simply argues that "it is for the jury to determine whether the disparate treatment is due to [his] sex rather than for reasons proffered by the Defense."[55]

Under the burden-shifting *McDonnell Douglas* analysis, Friel must first establish a *prima facie* case of discrimination based on his sex. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To do so, he must show: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) nonmembers of the protected class were treated more favorably under circumstances giving rise to an inference of unlawful discrimination. *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 327 (3d Cir. 2015) (citation omitted). Establishing a *prima facie* case of discrimination "is not onerous and poses a burden easily met." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) (internal quotation marks omitted) (quoting *Tex. Dep't of Corr. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

If the plaintiff fails to establish a *prima facie* case, the defendant is entitled to judgment as a matter of law. Contrary to Friel's assertion, the determination of whether a *prima facie* case has been established is, under most circumstances, a question of law for the court. *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 347 n.1 (3d Cir. 1999).

If he succeeds in establishing a *prima facie* case, the burden shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for the adverse employment action."

[54] Pl.'s Resp. at 13.

[55] *Id.*

10

*Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). If the defendant satisfies its burden, the plaintiff must produce evidence from which a reasonable factfinder could conclude that the proffered reason for taking the adverse action was merely a pretext for intentional discrimination. *Makky*, 541 F.3d at 214. The final burden of production "merges with the ultimate burden of persuading [the jury] that [he] has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256.

There is no dispute that Friel has satisfied the first two elements of a *prima facie* case. He is a member of a protected class and he is qualified for his position. The dispute is over the third and fourth elements. The issues are whether the complained of employment actions were adverse and whether Friel was treated differently than females in the same circumstances.

As to the third element, the denial of Friel's shift change requests and his annual performance evaluation were not adverse employment actions. His suspension was.

An "adverse employment action" under Title VII's anti-discrimination provision is "'an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" *Jones*, 796 F.3d at 326 (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)) (internal quotation marks omitted). What qualifies as an adverse employment action is broader than this statutory definition. It includes "'firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits,'" *Remp v. Alcon Labs., Inc.*, 701 F. App'x 103, 106–07 (3d Cir. 2017) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)), giving an employee a potentially less profitable sales position, *Goosby v. Johnson & Johnson Med., Inc.*, 228

F.3d 313, 319 (3d Cir. 2000), failing to rehire someone, *Sarullo v. USPS*, 352 F.3d 789, 800 (3d Cir. 2003), and revoking a person's office, dismissing her secretary, and assigning her less work, *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 153–54 (3d Cir. 1999).[56]

The denial of Friel's shift change requests and his 2016 performance evaluation did not adversely affect the terms and conditions of his employment. He was not denied a promotion, given significantly different responsibilities, or assigned less work. His salary was unaffected. Significantly, Friel admitted that seniority was a reason his requests were denied.[57] His overall performance evaluation score did not change in 2016. Although his score decreased in two categories, it increased in two others, resulting in the same score as he received in 2015.[58] He also received the same time-off award in 2016 as he did in 2015 based on his score.[59] Friel's performance evaluation did not change. Nor did it have an adverse effect on his employment.

Friel's five-day suspension is another matter. Disciplinary actions can constitute adverse employment actions if they "effect a material change in the terms or conditions

[56] The standard for an adverse employment action differs in the retaliation context. For retaliation purposes, an adverse employment action is one that would dissuade a reasonable employee from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 63, 68 (2006). An action that would dissuade a reasonable employee from engaging in protected activity may not be serious or tangible enough to materially alter the conditions of employment. In this sense, conduct that does not constitute an adverse employment action for the *prima facie* case of sex discrimination may qualify as an adverse employment action for the *prima facie* case of retaliation. *See id.* at 60–61 (concluding that the anti-retaliation provision in Title VII prohibits different employer actions than the actions prohibited by the anti-discrimination provision).

[57] *See* Friel Dep. Tr. at 227:4-12 ("Q: But why would you not get it because you were No. 12 on the listing in the inner AWE and order? A: Because there's people ahead of me that would get that . . . . Because they were there longer").

[58] *Id.* at 271:19-273:19; Def.'s Mot. for Summ. J. Exhs. M, N (awarding Friel an overall rating of "Exceeds Fully Successful").

[59] Def.'s Mot. for Summ. J. Exhs. M, N.

of [the] employment." *Weston v. Pennsylvania,* 251 F.3d 420, 431 (3d Cir. 2001), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). The suspension was unpaid,[60] and it rendered Friel ineligible for a time-off award the following year.[61] The time-off award would have been equivalent to roughly a week's pay.[62] A suspension without pay may qualify as an adverse employment action for purposes of establishing a *prima facie* case of discrimination. *See Jones*, 796 F.3d at 327. Because the suspension and award ineligibility affected Friel's compensation, they were adverse employment actions.

Nonetheless, Friel has not satisfied the fourth element of sex discrimination. He has not shown that the employment actions were gender-based and that women in the same circumstances were treated more favorably. In fact, he admitted that they were not gender-based.

Friel testified that he was denied a shift change because of his relationship with Hernandez, not because of his gender. He testified:

> Q: But on the shift change request at least, Mr. Friel, are you alleging that you were denied because you are a man and women got that shift change because they were women?
>
> A: No. That was a result of my relationship with Claudia Hernandez and who the DM was at the time.[63]

[60] Friel Dep. Tr. at 344:22-24.

[61] *Id.* at 288:14-18.

[62] *Id.* at 288:4-10.

[63] *Id.* at 278:13-20.

He also admitted that his lower performance evaluation in 2016 was not based on his gender. His complaint, which he later recharacterized as "retaliation," was that he was treated differently than his co-workers, male and female.

Q: How is your lower performance evaluation, as you call it, disparate treatment? . . .

A: This – my complaint, which I put in, was that I was not evaluated the same as my coworkers. That was my complaint.

Q: Right, but was it specific to gender?

A: That specific instance, I don't know if – no. I would say no.

Q: So then that's not a disparate treatment allegation?

A: Not that.

Q: Not on the basis of gender at least?

A: Not that specifically. That was retaliation.[64]

He conceded that his suspension and subsequent denial of an award would not have been different had he been female.

Q: I'm saying when somebody did the type of thing that you said you did, sent those type [sic] of messages or something similar to that, are you saying that there were females who weren't suspended or someone of a different gender solely because of their different gender?
. . .

A: Specifically, no.[65]

Friel has not produced any evidence that the IRS handled his shift change request, his performance rating or his disciplinary proceeding any differently than it would have in the case of a female employee in the same position and the same circumstances. Nor

---

[64] *Id.* at 274:6-275:16.

[65] *Id.* at 292:13-293:18.

has he presented any admissible evidence demonstrating that the IRS handled complaints of sex discrimination by female employees differently. He stated in his deposition that he generally heard about other cases of female employees who, after they alleged sexual harassment, were separated from their harasser.[66] When pressed, he offered only one non-specific example, stating "[t]here is a manager, his name is Mike, and I can't recall his last name. He had a female employee who alleged sexual harassment, and he was moved out of the unit."[67] This second-hand anecdotal evidence is not only inadmissible hearsay, it is indefinite. One cannot determine whether the allegation was sustained or not. When asked for documents regarding any other cases, he did not have any.[68] Therefore, because he has not shown that females were treated any differently than he was in the same circumstances, Friel has failed to establish a *prima facie* case of sex discrimination.

*Retaliation*

The *McDonnell Douglas* burden-shifting framework applies in retaliation cases. *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir. 1997). The plaintiff must first establish a *prima facie* case of retaliation. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) his employer took adverse employment action against him after or contemporaneously with his protected activity;

---

[66] *Id.* at 66:23-67:15.

[67] *Id.* at 67:24-68:3.

[68] Goudarzi Dep. Tr. at 62:17-63:4.

and (3) there was a causal connection between his protected activity and the adverse employment action. *Daniels*, 776 F.3d at 193; *Moore v. City of Phila.,* 461 F.3d 331, 340–41 (3d Cir. 2006).

Friel engaged in protected activity when he filed EEO complaints on August 24, 2016, September 7, 2017 and November 7, 2018.[69] But, his complaints to TIGTA and Hernandez, his romantic partner, before they broke up about Goudarzi's harassment were not protected activity.[70]

Friel did not allege gender or other unlawful discrimination in the complaints to TIGTA and Hernandez.[71] He complained of the treatment he received because he was dating another worker's wife. None of his complaints to TIGTA and Hernandez complained of discrimination. *See Slagle v. Cty. of Clarion,* 435 F.3d 262, 268 (3d Cir. 2006) (holding that plaintiff's "vague allegations of 'civil rights' violations," without reference to discrimination based on any protected category, did not constitute protected conduct under Title VII); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995) (holding that plaintiff's "general complaint of unfair treatment d[id] not translate into a charge of illegal *age* discrimination" under the ADEA) (emphasis in original).

Friel identifies five adverse employment actions he claims were in retaliation for his complaining about discrimination. They are: (1) denial of his shift change requests; (2) the counseling memo that resulted from Hernandez's accusations; (3) the lower annual performance review; (4) a lack of promotion; and (5) suspension resulting in award

---

[69] Def.'s Mot. for Summ. J. Exhs. D, F, G.

[70] Pl.'s Resp. at 14.

[71] Pl.'s Resp. at Exh. 16 at FRIELB000604.

ineligibility.[72] The first three actions occurred before he engaged in any protected activity. Friel was never denied a promotion. Although his suspension may qualify as an adverse employment action, he has not demonstrated that it was causally connected to protected activity.

Friel's unsuccessful efforts to change his work schedule pre-dated his protected activity.[73] From 2012 until 2015, he worked an "alternate work schedule" of 9:00 am to 6:30 pm Monday through Friday, with every other Friday off.[74] Over the years, he requested to work 7:00 am to 4:30 pm so that he could take classes to obtain a college degree. He was finally granted the work schedule he wanted in June 2015.[75] He did not initiate his EEO proceedings until 2016.[76] Therefore, aside from the fact that they were related to his lack of seniority, the denials of his shift change requests could not have been in retaliation for his complaints.

The counseling memo and the performance evaluation also pre-dated Friel's protected activity. The counseling memo is dated February 10, 2016, more than six months before he filed his first EEO complaint in August.[77] His 2016 performance review occurred in May 2016, three months before his first EEO complaint.[78] Thus, because Friel

---

[72] Def.'s Mot. for Summ. J. at 14. Friel does not dispute this characterization of his allegations.

[73] Friel Dep. Tr. 167:15-18.

[74] *Id.* at 188:1-18.

[75] *Id.* at 181:21-25; 217:15-218:25.

[76] *Id.* at 116:17-19, 167:15-21, 169:1-4; Def.'s Mot. for Summ. J. Exh. J. at FRIELUSA000736.

[77] Def.'s Mot. for Summ. J. Exh. K.

[78] Def.'s Mot. for Summ. J. Exh. N.

has not shown that these employment actions were causally connected to protected activity, he cannot satisfy the third element of a retaliation claim based upon them.

Neither the counseling memo nor the performance evaluation were adverse employment actions. The counseling memo was advisory.[79] It did not impose any disciplinary consequences, and only warned of possible future action if he engaged in similar behavior again.[80] Friel admitted that he was not suspended or otherwise disciplined.[81] *See*, *e.g.*, *Weston*, 251 F.3d at 431 (finding no adverse employment action where plaintiff failed to show the written reprimands caused a material change in the terms or conditions of his employment)."

Friel's performance evaluation score was not an adverse action. It did not change in 2016. Although his score decreased in two categories, it increased in two others, resulting in the same score as he received in 2015.[82] He also received the same time-off award in 2016 as he did in 2015.[83] Friel has not demonstrated that the lower score in two categories had any tangible consequences for his employment. *See*, *e.g.*, *Clark v. Phila. Hous. Auth.*, 701 F. App'x 113, 117 (3d Cir. 2017) (finding no adverse action for purposes of retaliation where plaintiff did not show her negative performance review adversely affected the terms or conditions of her employment); *Barnett v. N.J. Transit Corp.*, 573 F. App'x 239, 244 (3d Cir. 2014) (finding no adverse action for purposes of retaliation where

---

[79] Def.'s Mot. for Summ. J. Exh. K.

[80] *Id.*

[81] Friel Dep. Tr. at 252:6-253:6.

[82] *Id.* at 271:19-273:19; Def.'s Mot. for Summ. J. Exh. M, Exh. N (awarding Friel an overall rating of "Exceeds Fully Successful").

[83] Def.'s Mot. for Summ. J. Exh. M, Exh. N.

plaintiff "failed to show, or even allege, that [the negative performance review] had any effect on her employment status. She was not fired from the training program, she was not demoted, and there was no change in her pay and benefits."); *Ponton v. AFSCME*, 395 F. App'x 867, 874 (3d Cir. 2010) (finding negative performance evaluation did not constitute a materially adverse action as plaintiff received an overall positive score). Friel's performance evaluation did not materially change.

Friel has not shown any failure to promote that constitutes an adverse employment action. He testified that he did not receive several promotions because he was in "harm's way" at the hands of Nader Goudarzi and "others in management."[84] He does not identify a position he applied for and was denied. Indeed, he was promoted and received all grade and step increases to which he was entitled.[85]

As it did for his sex discrimination claim, Friel's unpaid suspension qualifies as an adverse employment action for purposes of retaliation. A five-day suspension without pay that also made him ineligible for a performance award, it was sufficient to "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.,* 548 U.S. at 68. Thus, it was materially adverse.

Although the suspension was an adverse employment action, Friel has not shown that it was causally connected to any protected activity. He first met with an EEO counselor in May 2016. He was suspended in September 2018, two years and four months later. Even when viewed in the light most favorable to him, this timing does not suggest causation. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)

---

[84] Friel Dep. Tr. at 58:3-10; 60:21-61:2; 71:17-21; 102:24-103:4.

[85] *Id.* at 28:1-30:13; 245:11-247:5.

("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'. . . Action taken (as here) 20 months later suggests, by itself, no causality at all.") (citations omitted); *Daniels*, 776 F.3d at 198 (finding no "unusually suggestive" temporal proximity where ten months passed between the protected activity and the adverse action) (citations omitted). Thus, we conclude Friel has not made out a *prima facie* case of retaliation.

Even if Friel had, the IRS has articulated a legitimate, non-discriminatory reason for his suspension that Friel has not challenged with evidence of pretext for discriminatory animus. The IRS contends Friel was suspended for making unprofessional, inappropriate and threatening comments to Special Agent Vandiehl, the IRS Commissioner, and several supervisors.[86] Friel does not dispute that the two incidents occurred and the recipients found the messages threatening.[87] Instead, he now contends that suspension, which he did not appeal,[88] was not appropriate.[89] He does not believe the messages were threatening.[90] He also claims that he had his supervisor's permission to leave the building for medical attention because he was feeling ill.[91]

---

[86] Def.'s Mot. for Summ. J. at 25-26.

[87] Friel Dep. Tr. at 279:5-15; 284:12-15.

[88] *Id.* at 287:20-287:23.

[89] *Id.* at 286:19-24.

[90] *Id.* at 286:15-24.

[91] *Id.* at 282:5-14.

Gonzalez was aware of Friel's EEO activity at the time she imposed the suspension.[92] Other than her awareness of the EEO proceedings, nothing in the record suggests her decision was actually motivated by Friel's protected activities. In her EEO affidavit, Gonzalez explicitly states that the "actions that led to [Friel's] five-day suspension stand alone."[93] A reasonable person reviewing the messages would find they were threatening and unprofessional.

As for the denial of a performance award in 2018, Friel acknowledged that it is IRS policy to deny performance awards to employees who were suspended.[94] The three executive panel members who reviewed the decision determined that Friel did not qualify for an exception to the policy.[95] The panel members were from different offices, none of whom supervised Friel. There is no evidence to suggest any of them knew about his protected activities.[96] *Daniels*, 776 F.3d at 196 ("The plaintiff, however, cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted."). No reasonable jury could conclude that Friel's suspension and the denial of the performance award were retaliation for his protected activities.

*Hostile Work Environment*

To succeed on a hostile work environment claim, Friel must establish that: (1) he suffered intentional discrimination because of his protected status; (2) the discrimination

---

[92] *Id.* at 291:2-5.

[93] Def.'s Mot. for Summ. J. Exh. P at USAFRIEL000189.

[94] Friel Dep. Tr. at 288:14-18.

[95] *Id.* at 288:19-23; Def.'s Mot. for Summ. J. Exh. G at USAFRIEL000085.

[96] Friel Dep. Tr. at 288:19-290:11.

was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) there is respondeat superior liability. *Minarsky v. Susquehanna Cty.*, 895 F.3d 303, 310 (3d Cir. 2018) (quoting *Mandel v. M & Q Packaging Corp.,* 706 F.3d 157, 167 (3d Cir. 2013)).

Friel cites a single instance of *sexual* harassment. Shortly after he broke up with Hernandez, she tugged on the back of his shirt and suggested they should "just be together one more time."[97] Assuming it happened,[98] this type of conduct may constitute sexual harassment for purposes of Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) ("'Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature'" may rise to the level of sexual harassment) (quoting 29 C.F.R. § 1604.11(a) (1985)); *Durham Life Ins. Co.*, 166 F.3d at 148 ("We generally presume that sexual advances . . . are sex-based, whether the motivation is desire or hatred"). Hernandez's entreating him to "be together one more time" appears to be a solicitation for sex.

An isolated or single incident of harassment, unless extremely serious, does not establish a hostile work environment. *Caver v. City of Trenton*, 420 F.3d 243, 262–63 (3d Cir. 2005) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). The conduct must be so severe or pervasive that it alters the terms and conditions of the plaintiff's employment and creates an abusive work environment. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

---

[97] *Id.* at 142:9-14.

[98] Hernandez, in her deposition, denied that this incident happened. Hernandez Dep. Tr. at 89:10-13.

In determining whether harassment is sufficiently severe or pervasive to create a hostile work environment, we consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening . . . or a mere offensive utterance; and whether it reasonably interferes with an employee's work performance." *Mandel*, 706 F.3d at 168 (quoting *Harris,* 510 U.S. at 23). It is not enough that "the employee subjectively perceives [the environment] as abusive or hostile[.]" *Ullrich v. U.S. Sec'y of Veterans Affairs,* 457 F. App'x 132, 140 (3d Cir. 2012). The environment must also be "objectively hostile or abusive," one "a reasonable person would find hostile or abusive." *Id.* (quoting *Harris*, 510 U.S. at 21).

Friel has proffered evidence of a single isolated incident of sexual harassment. It was not extremely serious. He testified that Hernandez pulled on his shirt a few times during a conversation and she stopped when he told her it was "inappropriate."[99] The incident was brief.[100] It did not interfere with Friel's job performance. He did not feel threatened or intimidated by it.[101] He has not pointed to any other instances of *sexual* harassment. In the context of the totality of the circumstances, especially Friel's relationship with Hernandez, no reasonable jury could conclude that this single instance was severe or pervasive enough to create an objectively hostile or abusive work environment.

Friel's claims involving Hernandez's false accusations, her post-break up text messages and Goudarzi's conduct are not founded on sexual harassment. They are non-

---

[99] Friel Dep. Tr. at 142:9-12; 155:5-21.

[100] *Id.* at 161:4-12.

[101] *Id.* at 159:13-19; 160:2-19.

sexual.

Not all workplace harassment violates Title VII. Title VII "does not set forth 'a general civility code for the American workplace.'" *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). It does not prohibit "all verbal or physical harassment in the workplace[.]" *Id.* Only harassment motivated by a discriminatory animus is prohibited. *Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 278 (3d Cir. 2001) (citing *Spain v. Gallegos,* 26 F.3d 439, 447–48 (3d Cir. 1994)). In other words, non-sexual harassment must be linked to discrimination, in this case sex.

Sex discrimination differs from sexual harassment. Sex discrimination is discriminating against someone because of his or her sex. Sexual harassment is unwelcome sexual advances or other verbal or physical contact of a sexual nature. To succeed on a claim for sex discrimination based on non-sexual harassment under Title VII, Friel must show that the non-sexual harassment was directed at him because he is male.

Friel has produced no evidence, direct or indirect, that this non-sexual harassment was motivated by sex discrimination. Based on his description of Hernandez's text messages, they were not sexual in nature.[102] Friel admitted that he instigated the text conversation while at work and allowed it to continue, rather than telling Hernandez to stop contacting him.[103] Friel has not offered evidence of the number, frequency or

---

[102] *Id.* at 150:8-151:2 ("Well, there was [*sic*] text messages . . . . She still wanted to be together, after I told her the reason why I was breaking up with her is because Nader was screwing me over for years. She said, I hope in the end we're going to be together.").

[103] *Id.* at 152:6-14 ("I can pinpoint the time that I did it, because I was in the garage when I sent the message to her saying that you let your husband screw me over for years and that's when she said she had gotten in a lot of arguments over it, and I was going my car [*sic*] when we were texting back and forth.").

contents of the text messages.[104]

Friel points to no evidence demonstrating that his gender was a factor in the treatment he claims he received from Hernandez, Goudarzi and his allies. Nor has he produced evidence that a female would not have been treated the same way. *Andrews v. City of Phila.*, 895 F.2d 1469, 1485 (3d Cir. 1990) (To make out a case under Title VII for sex discrimination, it is necessary to show that had the plaintiff been a man, she would not have been treated in the same manner) (citing *Tomkins v. Pub. Serv. Elec. & Gas Co.,* 568 F.2d 1044, 1047 n.4 (3d Cir.1977)). Friel admits that the conduct was instigated by his romantic relationship with Hernandez,[105] Goudarzi harassed him because he was dating his estranged wife, and Hernandez harassed him because he broke up with her.[106] Indeed, there is no evidence that had Friel been female in a relationship with Hernandez, he would have been treated differently. No reasonable jury could conclude that these actions were motivated by Friel's gender and that a woman in his place would have been treated differently. Thus, the defendant is entitled to summary judgment on the hostile work environment claim.

---

[104] *Id.* at 91:16-93:1.

[105] *Id.* at 36:14-18 (When asked what claim he was making in the complaint, he testified "[t]hat there was discrimination due to my relationship with Claudia Hernandez"); 143:16-18 ("During my relationship I was treated differently because of my relationship with her").

[106] Friel concedes as much in his Response. *See* Pl.'s Resp. at 13 ("Mr. Gaudarzi [*sic*] and his friends at the IRS harassed him because Mr. Gaudarzi [*sic*] was upset that Ms. Hernandez was having a romantic relationship with a different male. It got worse as the relationship between Mr. Friel and Ms. Hernandez was ending as Mr. [*sic*] Hernandez and her friends continued the harassment on a sexual and non-sexual level because she was upset with his decision.").

**Conclusion**

The undisputed facts show that the harassment Friel experienced was not motivated by a discriminatory animus and was not sufficiently severe or pervasive. Nor has he made out *prima facie* cases of sex discrimination based on disparate treatment and retaliation. Therefore, we shall grant the IRS's motion for summary judgment.